Newell Everett McCAULEY and Betty Lou McCauley, Appellants-Plaintiffs,

v.

C. J. STONE, Respondent-Defendant,

and

Roy E. Babcock, Appellant-Defendant.

Nos. 22725, 22728.

Kansas City Court of Appeals.

Missouri.

June 2, 1958.

**477**

Muster & Eveloff, Philip Eveloff, St. Joseph, for plaintiffs McCauley.

Sprague, Wilcox & Houts, St. Joseph, for appellant Babcock.

Strop & Strop, St. Joseph, for respondent.

BROADDUS, Presiding Judge.

This action brought by plaintiffs, Newell and Betty Lou McCauley against defendants Babcock and Stone is for property damage to their building, contents and truck, and for loss of business profit and loss of use of their truck, in a total amount of $2,700. Stone cross-claimed against Babcock, charging him with negligence, for damage to his Buick station wagon, praying for $735.55. The jury returned a verdict for plaintiffs for $2,445 against defendant Babcock and for defendant Stone for $703.55 against Babcock, and judgment was so entered. Defendant Babcock and plaintiffs appealed and the appeals were later consolidated.

Plaintiffs were the owners of a service station which was located about seven miles south of St. Joseph, on U. S. Highway 71, on the southwest corner of the junction of said Highway 71 and Connett Cut Off, or U. S. 71 Spur. This combination filling station, living quarters and gro-

478

cery store, and a 1948 Chevrolet truck owned by plaintiffs and parked on the property were damaged when struck on November 17, 1956, by a Buick station wagon owned and driven by defendant Stone, who was alone in the automobile at the time.

The accident occurred on a clear day. The pavement was dry. U. S. Highway 71, at the scene of the accident, ran north and south and was a paved concrete highway, 20 or 22 feet in width, which sloped from the south to the north from the crest of a hill south of the McCauley station. There were no "yellow" or "no passing" lines for northbound traffic on this hill. A road known as the Willowbrook or Agency Road, or as Highway "H" came into U. S. Highway 71 south of the McCauley filling station from the east and formed a "T" intersection with U. S. Highway 71. The center line of his Highway "H" was 200 feet south of the center line of the road known as the "Connett Cut Off", which came into Highway 71 from the west and formed a "T" intersection with U. S. Highway 71 on the north side of the McCauley station. There was a small junction sign facing northbound traffic, which designated the junction of Highway 71 straight ahead and Highway "H" to the right or east. This sign was on the east shoulder of 71 Highway and was 509 feet north of the crest of the hill. North of this sign, and just short of 600 feet from the crest of the hill, there was a surface drain referred to in the record as the first or south drain. Still further north and 918 feet from the crest of the hill there was a second surface drain, referred to as the north drain. This north drain was 318 feet north of the south drain and 182 feet south of the south edge of the Connett Cut Off. The south edge of the Connett Cut Off was 1100 feet north of the crest of the hill.

Concerning how the accident occurred, in view of the jury's verdict, we must accept the version of the defendant Stone and the three witnesses, Naomi Young, Clara Coale and Coleen Martin, who were passengers in a 1955 Pontiac preceding the Stone station wagon.

Stone's version supported by the three passengers in the Pontiac is as follows: Stone was driving his Buick station wagon, which was in good mechanical condition with good brakes, a clean windshield and with its steering mechanism in proper condition, north on 71 Highway following Naomi Young's Pontiac which in turn was following the Babcock pick-up truck over the crest of the hill south of the McCauley Service Station. He was then 50 to 100 feet behind the Young Pontiac which was on the east side of the highway, and was traveling at a speed of from 40 to 50 miles per hour. As the cars went north down the hill there was no obstruction in the passing lane and no southbound or other traffic except one-half mile to the north, and there was no traffic on the intersecting road from the right. Stone blew his horn to pass and the Young Pontiac pulled to the right in its lane. Stone then pulled into the unobstructed west passing lane. Stone then saw the Babcock pick-up truck ahead of the Young car in the right lane going north 50 to 100 feet ahead of the Young car. He intended to pass both vehicles and started to pass the Young car about 100 feet south of the south drain. Stone honked his horn and passed the Young Pontiac at a normal speed of from 55 to 65 miles per hour. Babcock's pick-up truck then pulled to the left 2 or 3 feet, or a half a truck's width, over the center line, thus holding Stone back in his passing operation. Stone could have completed his passing operation and gotten back into his right lane easily before he reached the north drain if Babcock had not "drifted" or "sashayed" into the left lane. Stone put on his brakes and honked loudly again. When Stone honked his horn Babcock pulled back into the right lane and straightened up on his right side of the road. Stone then released his brakes and stepped on the accelerator. At that time Babcock was traveling 25 to 35 miles per hour followed by the Young car at a speed of around 40 miles per hour, but later Babcock slowed down. All the cars continued

to move north. Then to Stone's surprise and without Babcock giving any mechanical or light signal or arm signal of his intention to turn left again, Babcock turned completely across in front of Stone's station wagon, closing Stone's travel or passing lane. This turn, beginning at the south of the McCauley property was gradual at first, and later was sharp or "whipping" and occurred at the north or last drain. Babcock thus "cut the corner" across the filling station property. When this turning occurred Stone applied his brakes hard to keep from hitting Babcock and turned to the left into the filling station driveway at the edge of the grass north of the drain. At the time, Stone could not get back into the right lane because of the Babcock truck and the Young Pontiac. He had no other choice according to Naomi Young and C. J. Stone himself. After Stone's station wagon entered the filling station driveway it went between the building and the tractor parked on the west side of the pumps, striking the building and continued on to strike the McCauley parked truck and a barrel and came to rest 40 or 50 feet behind the Babcock pick-up truck on the south side of 71 Spur or the "Connett Cut Off". The Babcock truck in the meantime went on past the pumps and turned west onto the "Connett Cut Off."

Appellant Babcock's first contention is that the court erred in failing to direct a verdict for him upon Stone's cross-claim because Stone was contributorily negligent as a matter of law. The contention is based upon Sec. 304.016 RSMo 1949, as amended in 1953, V.A.M.S., which provides that "no vehicle shall at any time be driven to the left side of the roadway under the following conditions * * * (2) * * * when approaching within one hundred feet of or at any intersection * * *."

In the case of Kraft v. Armentrout, Mo. App., 275 S.W.2d 402, 403, the statute under consideration on the issue of plaintiff's contributory negligence prohibited passing of a vehicle from the rear "while the vehicle is crossing an intersecting high-

way." Section 304.020(5) RSMo 1949, V.A. M.S. After reviewing the cases we reached the conclusion that the passing by a motorist of another vehicle at an intersection in violation of the statute is not contributory negligence as a matter of law *under any and all circumstances*.

■ We have set out the evidence somewhat in detail and there is no need to dwell upon it here. Why, it may be asked, didn't Stone complete his passing as he testified he could have done, and as Naomi Young testified he could have done, before he reached the north surface drain, which was 182 feet south of the intersection? Simply because Babcock's truck pulled to the left. Thus Stone could neither pass nor get back into the right lane. Certainly the evidence presents a question concerning whether Stone was "passing" in the prohibited 100 feet of an intersection, or whether he was in the passing lane in said area because of Babcock's actions in not permitting him to complete his passing prior to reaching the prohibited area. In our opinion, the court did not err in failing to direct a verdict against Stone upon his cross-claim.

■ Appellant Babcock's next contention is that the trial court "erred in the exclusion of evidence that defendant Stone was convicted of careless and reckless driving." His counsel offered to prove by cross-examination or by record of conviction that on January 9, 1957, in the Magistrate Court, Stone was convicted of careless and reckless driving as a result of the accident out of which the instant lawsuit arose. The court sustained Stone's objections to such offers upon the ground that Stone had taken an appeal from said conviction, and that the appeal was then pending in the Circuit Court.

■ The general rule pertaining to this question is thus stated in 98 C.J.S. Witnesses § 507, page 414: *"Except where an appeal is regarded as setting aside the judgment of conviction, or suspending the judg-*

*ment so that it cannot become final until the termination of the appeal,* the pendency of an appeal from a conviction of crime does not preclude the showing of such conviction as bearing on the credibility as a witness."

■ In Missouri, appeals in misdemeanor cases from the Magistrate Court to the Circuit Court are tried *de novo*. Our Supreme Court's Rule 22.16, 42 V.A.M.S. states: "After a case appealed from a magistrate court has been entered upon the docket of the circuit court * * * *the case shall be heard, tried and determined de novo* in the circuit court as though the *prosecution had originated* in such court."

■ Thus the present rule pertaining to appeals from Magistrate Courts is the same as the law had been with reference to Justice Courts. On an appeal from the judgment of a justice of the peace, the cause was tried *de novo* in the circuit court.

Our courts at an early date held that the effect of an appeal to the circuit court from the judgment of a justice of the peace was to vacate and set such judgment aside. Earl v. Collins, 89 Mo. 263. Some of the cases announced that by the prosecution of an appeal the judgment was "as if it had never been; it was final and binding upon no one." Turner v. Northcutt, 9 Mo. 251; Dennis v. Crooks, 23 Mo.App. 532, 537.

In the case of Sublette v. St. Louis, I. M. & S. Ry. Co., 96 Mo.App. 113, 121, 69 S.W. 745, 747, this language appears: "There would be very persuasive force in this contention if the judgment of a justice of the peace possessed the same finality after an appeal therefrom as does a similar judgment of the circuit court. But such is not the case. Under the law governing proceedings before justices, it is settled that an appeal from such a judgment to the circuit court, where, by our statute law, a trial anew may be had upon the original cause of action, vacates the justice's judgment pending the appeal, and until the appeal is finally disposed of."

In 1926 in the case of State v. Shelton, 314 Mo. 333, 284 S.W. 433, 437, our Supreme Court announced the rule that it is improper to show a conviction, even though it had occurred in the *circuit court,* where an appeal is pending, using this language:

"The court is charged with error in refusing defendant permission to show that witness John Mullinix had been convicted in the circuit court for violating the prohibition laws of the state. The record shows that an appeal was taken by the witness to this court, and that the cause was pending here when this case was tried. The trial court was within the law in holding as above indicated. When the case was appealed to this court, the appeal suspended the operation of said judgment and transferred the cause here."

Plaintiffs and defendant Stone rely upon that decision, but it does not aid them. While that case was decided by the court *en banc,* the opinion did not have the concurrence of a majority of the judges, except as to the result. Thus the decision is of instructive value only. Heald v. Aetna Life Ins. Co., 340 Mo. 1143, 104 S.W.2d 379, 384.

Appellant Babcock relies upon the case of Fisher v. Gunn, Mo.Sup., 270 S.W.2d 869, where it was held that a defendant had the right to ask the plaintiff if he had been convicted in the magistrate court for careless and imprudent driving. That case is not in point because *no appeal was pending* from the conviction there involved.

Appellant Babcock quotes from 58 Am. Jur. 402. However, that quotation is predicated upon citations of authorities where the appeals pending were from a conviction in either a circuit or district court and where the appeals in such instances are not appeals which are tried *de novo,* such as appeals in Missouri from a Magistrate conviction.

The dearth of cases involving the use of *appealed* convictions from Justice or Magistrate Courts establishes that the Bar

of this State has long recognized the nature of a trial *de novo* on such convictions as being the type covered by Supreme Court Rule 22.16, i. e., a trial the same "as though the prosecution had originated in such court," or, as aptly stated by the Court in State v. Smith, Mo.App., 264 S.W. 52, 53, affirmed 306 Mo. 451, 267 S.W. 869 as a trial had *"as if no action whatever had been instituted in the court below."*

It makes no difference whether the Magistrate's judgment of conviction against Stone was vacated when he took an appeal, or whether it merely remained *"suspended* pending the outcome of the appeal," as the case of Leonard v. Security Building Co., 179 Mo.App. 480, 162 S.W. 685, 687, says. In either event, it was not "binding" upon him when the trial in the instant case took place. Thus the ruling of the trial court was correct.

Appellant Babcock's last point is that "the court erred in giving plaintiffs' Instruction No. 5 because it submitted the wrong measure of damages concerning (a) loss of use of plaintiffs' truck and (b) plaintiffs' building."

■ The jury awarded plaintiffs the sum of $96 for loss of the use of their truck. Plaintiffs' evidence shows that they lost the use of the truck for 12 to 13 days; that the rental value was $8 to $10 per day, plus mileage of 10¢ a mile; that 12 to 13 days to repair the truck was a reasonable and necessary length of time; that plaintiffs lost $73.50, when they could not make certain specific hauling trips, while the truck was being repaired; that another truck, with a stock rack, was not available.

The language of the instruction is "if you find that said truck was used by plaintiffs for business purposes, you may also take into consideration the reasonable value of loss of use of their truck, if any, for a reasonable period of time, as shown by the evidence in the case, necessary to repair the same * * *." An instruction containing almost this identical language met with the approval of the St. Louis Court of Appeals in the case of McFall v. Wells, 27 S.W.2d 497, 498.

In the case of Weller v. Hayes Truck Lines, 355 Mo. 695, 197 S.W.2d 657, 663, our Supreme Court used this language:

"It is well settled that ordinarily the measure of damages for injuries to personalty is the difference between its reasonable values before and after the injury. * * * It is also well settled in this state that where the personal property injured is a motor vehicle then damages for loss of use are also one of the elements to be considered in arriving at the extent of the injuries * * * damages for loss of use * * * certainly follow as the 'natural, necessary and logical' consequences of defendant's wrongful act * * *. It is difficult to conceive of an injury to an automobile * * * which does not import as an inevitable consequence loss of use for some period of time. * * * Accordingly we rule that an allegation of damages for loss of use did not have to be specifically stated in the petition."

From the above authorities it is clear that the contention lacks merit.

■ As to the damage to plaintiffs' building the instruction authorized the jury to assess "such sum as you believe from the evidence, represents the difference between the reasonable market value of the store building immediately before the collision and the reasonable value immediately after the collision, not to exceed $2000 * * *." That this is the correct rule on the measure of damages to real estate is established by a long line of authorities in the State. And plaintiffs' evidence supported the instruction. It was that the value before the collision was from $8,500 to $9,000, and afterwards around $6,500 to $7,000, or a loss of $2,000. Appellant Babcock contends that plaintiffs' recovery should be limited to $1,730.23. This amount represented merely an estimated cost of repairs submitted to plaintiffs by a

contractor. There was no evidence that this sum represented the actual cost of restoring the building to its original condition. On the contrary, a strong inference appears from the evidence that it did not. What appellant's contention really amounts to is that the sum awarded plaintiffs was excessive. His motion for new trial contains no such complaint. Neither does his brief. We rule the point against appellant.

As stated, plaintiffs appealed from the judgment in favor of Stone and against them. In their brief they state: "If Babcock had not appealed, McCauleys would not have appealed." During the oral argument their counsel stated that if this court took the view that the judgment against Babcock should be upheld they would not press their appeal. We have reached that conclusion.

The judgment is affirmed. All concur.